UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY J. FAWCETT, | : | **Case No. 4:07-cv-1412** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | **MEMORANDUM OF OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | : | **AND ORDER** |
| | : | |
| **Defendant.** | : | |

This is an action for judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") denying the application of the Plaintiff, Anthony J. Fawcett, for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.  Pursuant to Local Rule 72.2(b), this matter was referred to Magistrate Judge David S. Perelman for preparation of a Report and Recommendation ("R&R").  In his R&R, the Magistrate Judge concluded that the holding by Administrative Law Judge ("ALJ") Thomas Ciccolini that Fawcett did not have a severe impairment was an error of law, but the Magistrate Judge nevertheless recommended that final judgment should be entered in the Commissioner's favor, rather than to "order yet another remand only to reach a foregone conclusion" that Fawcett would be found capable of performing sedentary work and "not disabled" under the Social Security Act.  (Doc. 17 at 7-8.)  Fawcett has filed timely objections to the R&R (Docs. 18-19), and the Commissioner has filed a response to Fawcett's objections (Doc. 20).  For the reasons articulated below, the Court agrees with the Magistrate Judge that the ALJ's holding that Fawcett did not have a severe impairment was an error of law, but the Court declines to adopt the R&R and enter final judgment in favor of the Commissioner.  Instead, the Court **VACATES** the final administrative decision of the Commissioner and **REMANDS** this case for further proceedings consistent with this opinion.

# I.    BACKGROUND

## A.    Procedural Background

Fawcett's DIB application has engendered a lengthy procedural history.  In fact, as discussed more fully below, this appeal represents the second time this Court has reviewed a denial of Fawcett's application by an ALJ.

Fawcett filed his DIB application on May 30, 2001, alleging that he was disabled under Title II of the Social Security Act as of his alleged onset date of November 7, 1987, or at least by the time his insured status expired on March 31, 1989 - Fawcett's Date Last Insured ("DLI") - because of lower back problems arising from a work-related injury.    In late 2001, the Ohio State Agency denied Fawcett's DIB application, both initially and upon reconsideration.  In January 2002, Fawcett requested a *de novo* hearing before an ALJ.  On May 15, 2003, Fawcett appeared with counsel and testified at an administrative hearing before ALJ John P. Brundage.  In a decision dated May 27, 2004, ALJ Brundage issued a decision unfavorable to Fawcett.  ALJ Brundage found that, while Fawcett had the severe impairment of a back disorder, Fawcett retained the residual functional capacity to perform sedentary work and that, after considering his age, education, and work experience, he was not under a "disability" as defined in the Social Security Act.  On October 24, 2004, the Appeals Council denied Fawcett's request for review of ALJ Brundage's decision, thereby rendering ALJ Brundage's decision the final decision of the Commissioner.

On December 13, 2004, Fawcett sought judicial review of ALJ Brundage's decision pursuant to 42 U.S.C. § 405(g).  Fawcett's action was referred to Magistrate Judge Perelman for a R&R.  On July 13, 2005, Magistrate Judge Perelman issued his R&R, recommending that the Court vacate ALJ Brundage's decision and remand the matter for further proceedings, because ALJ Brundage had "committed an incredible error" by totally neglecting to address or consider the deposition testimony

of Fawcett's treating physician, Dr. James Dambrogio.  The R&R also recommended that the matter be remanded with instructions that it be assigned to a different ALJ.  With no objections having been filed, this Court adopted the R&R, vacated ALJ Brundage's decision, and remanded the case pursuant to sentence four of 42 U.S.C. § 405(g) for additional factual determinations, including a proper evaluation of Dr. Dambrogio's testimony, by a different ALJ.

Upon remand, Fawcett's DIB application was referred to ALJ Thomas Ciccolini.  On July 19, 2006, ALJ Ciccolini conducted an evidentiary hearing.  Fawcett did not attend the hearing, but he was represented by counsel.[1]  Dr. Franklin Plotkin, a Medical Expert ("M.E."), and Thomas Nimberger, a vocational expert ("V.E."), both testified at the hearing.

A little more than a week later, on July 27, 2006, ALJ Ciccolini entered a decision holding that Fawcett did not have a severe impairment on or before his DLI of March 31, 1989 and therefore was not disabled under the Social Security Act.  Specifically, ALJ Ciccolini made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 1989.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 7, 1987 though the date last insured of March 31, 1989 (20 C.F.R. § 404.1520(b) and 404.1571, *et seq.*).

3. Through the date last insured of March 31, 1989, the claimant had the following medically determinable impairment: a back disorder (20 C.F.R. § 404.1520(c)).

4. Through the date last insured of March 31, 1989, the claimant did not have an impairment or combination of impairments that significantly limited his ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 C.F.R. § 404.1521).

---

[1]     Fawcett's counsel indicated that Fawcett waived his right to attend the hearing, because he was in custody awaiting trial.

3

    5.   The claimant was not under a "disability," as defined in the Social Security Act, at any time from November 7, 1987, the alleged onset date, through March 31, 1989, the date last insured (20 C.F.R. § 404.1520(c)).

(Tr. 504-11.)  On April 4, 2007, the Appeals Council denied Fawcett's request for review of ALJ Ciccolini's decision, thereby rendering ALJ Ciccolini's decision the final decision of the Commissioner.

On May 15, 2007, Fawcett sought this judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  As noted, Fawcett's action again was referred to Magistrate Judge Perelman for preparation of a R&R, and the Magistrate Judge's R&R ultimately recommended that final judgment be entered in the Commissioner's favor, despite concluding that ALJ Ciccolini's holding that Fawcett did not have a severe impairment was an error of law.  Specifically, in the R&R, the Magistrate Judge determined that:  (1) the standard as to what constitutes a severe impairment in the Sixth Circuit is clearly *de minimis* and that Fawcett appeared to have satisfied this minimal standard if there was any credence given to Dr. Dambrogio's deposition testimony; and (2) if the ALJ did  "read too much into" the testimony of the M.E. in determining that Fawcett did not suffer from a severe impairment, a "fair reading of that testimony clearly reflects the doctor's opinion that the objective medical evidence does not support [Fawcett's] extreme subjective complaints, and that [Fawcett] should, at least, be capable of sedentary work, which would call for the conclusion that [Fawcett] was not disabled as of March 31, 1989."  (Doc. 17 at  7.)  The Magistrate Judge therefore concluded, "Rather than prolong this matter for another several years on the basis that the ALJ's 'no severe impairment' holding was an error of law and order yet another remand only to reach a foregone conclusion, this Court recommends that final judgment be entered in defendant's favor."  (*Id.* at 8.)

4

On April 3, 2008, Fawcett timely filed two objections to the Magistrate Judge's R&R:  (1) the Magistrate Judge should not have afforded any weight to the testimony of the M.E., as the M.E. was not familiar with the deposition of the treating physician; and (2) if the Magistrate Judge was correct that Fawcett was capable of performing sedentary work, the Magistrate Judge failed to take into consideration Fawcett's bending limitations and Social Security Ruling ("SSR") 96-9p.  (Doc. 19 at 1.)  On April 17, 2008, the Commissioner filed a response to Fawcett's objections, primarily contending that:  (1) the ALJ appropriately considered and weighed the testimony of the M.E.; and (2) in contrast to the conclusion of the Magistrate Judge's R&R, substantial evidence in the record supports the ALJ's decision that Fawcett did not have a severe impairment on or before his DLI of March 31, 1989 and therefore was not "disabled."  (Doc. 20.)

### B. Factual Background

Fawcett was born on January 21, 1951.  Records indicate that, by 1972, Fawcett had completed high school and two years of college.  For purposes of this action, it is undisputed that Fawcett did not engage in substantial gainful activity between his alleged onset date of November 7, 1987 and his DLI of March 31, 1989.

#### 1. Chronological Summary Of Relevant Medical Evidence From November 7, 1987, Fawcett's Alleged Onset Date, Through March 31, 1989, The Expiration Of Fawcett's Insured Status

On November 7, 1987, at the age of thirty-six, Fawcett suffered a work-related injury, after he fell from the rear bumper of his truck to the ground.[2]  Since his injury, Fawcett has complained of persistent, severe pain across his lower back with radiation to the legs.  Fawcett alleges that he

---

[2]    Some records indicate that the injury occurred on November 9, 1987.  The Court, as both ALJ's, gives Fawcett the benefit of the doubt and assumes that the injury occurred on November 7, 1987.

cannot move right, bend, or lift because of the back injury.

On November 16, 1987, Fawcett began treating with James P. Dambrogio, D.O., his treating physician.  Dr. Dambrogio diagnosed Fawcett with an acute lumbosacral strain and sprain.  Dr. Dambrogio prescribed Darvocet (a pain medication) and Motrin for his pain, as well as physical therapy.[3]

On December 15, 1987, Dr. Dambrogio, in the first of numerous reports for the Ohio Bureau of Workers' Compensation (the "Bureau"), opined that Fawcett was disabled from employment, but indicated that his prognosis was "good."

On January 20, 1988, in a similar report for the Bureau, Dr. Dambrogio indicated that Fawcett was still disabled, but he estimated that Fawcett would be substantially able to return to his former position of employment on June 30, 1988.[4]

On January 26, 1988, in the context of the Workers' Compensation claim, Dr. Dambrogio administered a physical capacities evaluation to determine the degree of impairment that prohibited

---

[3]    Medical records show that Fawcett has continued physical therapy with Dr. Dambrogio for several years.

[4]    As hinted at above, almost all of the medical evidence in the record was generated in the context of a Worker's Compensation claim.  Accordingly, the record includes several reports by Dr. Dambrogio to the Bureau that were similar to the January 20, 1988 report.  For example, in a report dated February 24, 1988, Dr. Dambrogio estimated that Fawcett would be substantially able to return to his former position of employment as of July 1, 1988.  In a report dated June 6, 1988, Dr. Dambrogio estimated that Fawcett would be substantially able to return to his former position of employment as of October 1, 1988.  In a report dated September 23, 1988, Dr. Dambrogio estimated that Fawcett would be substantially able to return to his former position of employment as of February 1, 1989.  In a report dated December 23, 1988, Dr. Dambrogio estimated that Fawcett would be substantially able to return to his former position of employment as of April 1, 1989.   And finally, in a report dated March 6, 1989, Dr. Dambrogio estimated that Fawcett would be substantially able to return to his former position of employment as of July 1, 1989.

Fawcett from being gainfully employed.  Dr. Dambrogio reported to the Bureau that Fawcett showed a whole body strength impairment of 56.95% and a weight restriction of 13 pounds.  Dr. Dambrogio also reported that Fawcett had a loss of balance and an inability to assume a full squat or to rise.  Dr Dambrogio further reported that Fawcett's flexion/extension of his lumbar spine was 80 degrees with pain, right flexion was 10 degrees, and left flexion was 5 degrees.  Finally, Dr. Dambrogio reported that supine left leg lift was 20 degrees on the right and 10 degrees on the left (range 0-100).

On February 26, 1988 and March 5, 1988, Dr. Dambrogio examined Fawcett and reported that his balance was good, although he complained of pain with backward and forward movements.  Dr. Dambrogio also noted that Fawcett was unable to assume a full squat position or rise from a squatting position.

At a therapy session on April 5, 1988, Dr. Dambrogio reported that Fawcett was unable to stand-up straight, and he walked with a slight limp.  Dr. Dambrogio stated that Fawcett complained of pain down his legs, as well as continued lower back pain with forward and backward movements.

At a therapy session on April 22, 1988, Dr. Dambrogio reported that Fawcett complained of severe pain.  Dr. Dambrogio stated that Fawcett's back motion was severely reduced.

On April 28, 1988, Anand G. Garg, M.D., a neurosurgeon, examined Fawcett regarding his complaints of back pain.  In a letter to Dr. Dambrogio dated May 4, 1988, Dr. Garg noted the following from his exam: (1) Fawcett had moderate paraspinal muscle spasm with moderately restricted spinal movements; (2) Fawcett was able to do heel walking and toe walking very well, and there was no evidence of any kind of motor deficits; (3) Fawcett's straight leg raising was restricted to about 50 degrees on the right, and 60 degrees on the left; (4) Fawcett seemed to feel pinprick less over the entire right foot in the distribution of both L5 and S1; and (5) the remainder of the examination was satisfactory.  Dr. Garg summarized his impressions of the examination by stating,

7

"Except for sensory findings, the validity of which I am not sure about, there were no other abnormal objective findings." Dr. Garg then relayed to Dr. Dambrogio that Fawcett's initial evaluation should be with a CAT scan, and depending on the findings, possibly a myelography and post-myelogram CAT scan for a definitive diagnosis. Dr. Garg also informed Dr. Dambrogio that he reviewed Fawcett's X-rays of his lumbosacral spine and pelvis that were done on November 9, 1987 and that they were "satisfactory."

On July 25, 1988, Dr. Dambrogio prescribed Darovcet N 100 and Flexoril to help relieve Fawcett's complaints of pain.

On September 29, 1988, Dr. Dambrogio reported that Fawcett was experiencing pain that was worse than before. Dr. Dambrogio noted that there was decreased flexion of the lumbosacral spine, and therapy was administered.

On December 13, 1988, Dr. Dambrogio wrote a letter to the Bureau concerning Fawcett. Dr. Dambrogio stated that a physical examination of Fawcett on December 7, 1988 revealed marked spasm in the lumbosacral area with decreased deep tendon reflexes of both lower extremities. Dr. Dambrogio noted that Fawcett was able to flex the lumbar spine to 70 degrees, but he was unable to flex either right or left. Dr. Dambrogio then reported that Fawcett had done "exceptionally well" in the rehabilitation program. Dr. Dambrogio stated that Fawcett had lost 20 pounds and that his "flexibility and strength have improved dramatically." Dr. Dambrogio noted, however, "The exacerbation of Mr. Fawcett is a surprise to me and him. The symptomotology is consistent with Radicular disease or herniated disc disease. I am referring Mr. Fawcett to a neurosurgeon for consultation and am requesting additional tests." Dr. Dambrogio then recommended that Fawcett continue a conservative physical therapy program for an additional six weeks, until the results of the consultation and laboratory tests would be received.

On February 8, 1989, physicians at the Youngstown Osteopathic Hospital performed three different tests on Fawcett, including an electromyography ("EMG"), a computed tomography ("CT") scan of the lumbar spine, and X-rays of the lumbar spine.  The results of the EMG were incomplete due to poor tolerance by Fawcett, but the findings were suggestive of L4-L5 radiculopathy on the right side.  The results of the CT scan showed evidence of an extradural defect at the L4-L5 level due to disc protrusion to the right.  The results of the X-rays were essentially negative.

On February 17, 1989, in a letter to the Bureau concerning Fawcett, Dr. Dambrogio stated that "X-ray and CAT Scan performed on the lumbar area showed evidence of a herniated lumbar disc."  Dr. Dambrogio requested that the Bureau include the diagnosis of herniated lumbar disc in the allowed conditions and that continued therapy be approved.

On February 20, 1989, Dr. Dambrogio reported that Fawcett had flexion of 60 degrees, right and left side bending was 10 degrees, and that there was positive leg raising with pain down the right leg from the back.

On March 21, 1989, Dr. Dambrogio prescribed Demerol to help relieve Fawcett's pain.

### 2. Chronological Summary Of Relevant Medical Evidence Subsequent To The Expiration Of Fawcett's DLI Of March 31, 1989

On April 21, 1989, Dr. Dambrogio wrote a letter to the Bureau, repeating the requests that were in his February 17, 1989 letter to the Bureau, namely, that the Bureau include the diagnosis of herniated lumbar disc in the allowed conditions and that continued therapy be approved.

On April 24, 1989, Dr. Dambrogio fitted Fawcett with a lumbosacral corset to relieve his pain.

On June 26, 1989, A.D. Vamvas, Jr., M.D., rendered an opinion in Fawcett's workers' compensation claim to the Bureau that the "alleged condition, 'herniated disc' is in all reasonable

medical probability directly and causally related" to Fawcett's work-related injury.  Dr. Vamvas recommended "further allowance" to include the condition of herniated disc.

On August 21, 1989, Dr. Dambrogio wrote a letter to the Bureau reporting that, in an examination on July 28, 1989, Fawcett's flexion of the lumbar spine was 80 degrees with pain, right and left side bending was 5 degrees, and there was positive leg raising at 10 degrees on the right with pain radiating into the buttocks.  Dr. Dambrogio stated that Fawcett requested a consultation with E.B. Marsolais, M.D.

On October 24, 1989, Dr. Marsolais examined Fawcett.  In a letter to Dr. Dambrogio dated October 26, 1989,  Dr. Marsolais wrote that he was concerned that Fawcett had a thoracic disc, as his examination showed marked tenderness from about T9 through T12.   Dr. Marsolais recommended Fawcett undergo a thoracolumbar MRI.  Dr. Marsolais did note, however, "I doubt very much that the L5-S1 disc that has been identified is really causing him very much trouble, although he does have some instability at L5-S1.  I think this will respond to proper exercise . . . ." Nevertheless, in his examination notes, Dr. Marsolais indicated that review of the films from February 8, 1989 showed degenerative change at 3-4 mild and that the CT scan showed a bulging disc at 4-5.

On March 14, 1990, Fawcett underwent a MRI of his thoracic spine.  The results were "unremarkable."  The vertebral bodies were in reasonable anatomic alignment without evidence of gross deformity or subluxation.  There was no evidence for herniation of an intervertebral disc, no significant spinal canal narrowing was seen, and the thoracic spinal cord was normal in course and caliber.  No other areas of abnormal signal intensity were seen involving the bony spine or spinal canal contents.

On February 28, 1991, Dr. Garg re-examined Fawcett.  In a letter to Dr. Dambrogio dated

10

March 7, 1991, Dr. Garg reported that his examination revealed that Fawcett showed a lot of resistance during spinal movements and would only bend 10-20 degrees, that he could not relax, that he appeared to have paraspinal muscle spasm, and that his straight leg raising was restricted to about 20 degrees on the right and about 60 degrees on the left.  Dr. Garg added, "Otherwise, there were no motor or sensory deficits . . . ."  Dr. Garg also noted that, consistent with the results of the March 14, 1990 MRI of the thoracic spine, Fawcett's examination did not reveal any problems pertaining to his neck or the upper extremities or related to the thoracic spine area.  Dr. Garg stated that his symptoms still predominantly appeared to be more of lower back pain in the lumbosacral area with radiation down the right leg.  Dr. Garg, however, found no localization during his examination and therefore recommended a MRI of the lumbosacral spine.

On March 7, 1991, Fawcett underwent a MRI of his lumbar spine.  The results showed a "small herniated disc at the L4-L5 level extending posteriorly just to the right of the midline, of indeterminate clinical significance" and a "mild generalized annular bulge of the L3-L4 disc."  The remainder of the lumbar neural canal was proper in size, shape, and symmetry of nerve roots.  The spinal cord and nerve roots themselves were normal in course, contour, and caliber and there was no other sign of intra dural or extra dural lesion.  No significant bone abnormality was noted.

On March 11, 1991, Dr. Garg reviewed the lumbar spine MRI findings and discussed their significance with Fawcett.  In a letter to Dr. Dambrogio dated the same day, Dr. Garg reported that he told Fawcett that the lesions at the L3-L4 and L4-L5 level were "very small lesions and normally should not cause the kind of symptoms he is having."  Dr. Garg relayed that he was having a problem explaining the severity of his symptoms on the basis of these lesions alone.  Dr. Garg expressed his preference that Fawcett try a course of conservative measures before making any surgical decisions.  Dr. Garg strongly recommended that a physical therapy program with non-

11

steroidal, anti-arthritic agents to relieve Fawcett's symptoms.  Dr. Garg also noted that Fawcett's symptoms were "more of musculo-skeletal nature."  Finally, Dr. Garg concluded by informing Dr. Dambrogio that Fawcett should proceed with the conservative program and then be re-examined again in about four weeks.

On May 21, 1991, Dr. Garg again examined Fawcett.  In a letter to Dr. Dambrogio dated the same day, Dr. Garg wrote that Fawcett's symptomotology and clinical picture remained unchanged from Dr. Garg's previous examination in March 1991.  Dr. Garg relayed that, after re-reviewing the results of Fawcett's MRI of March 7, 1991, both lesions appeared to be more of an annular bulge and that the L4-L5 bulge may be a little more prominent.  Dr. Garg noted, "It is difficult to be sure that it is not a definite disc bulge.  It is a very small lesion and is not compromising his nerve roots, and just causing slight effacement of the dural sac."  Dr. Garg strongly recommended that, while one may consider percutaneous microdiscectomy for the L4-L5 level if symptoms linger,  Fawcett should still be treated aggressively with nonsurgical means.  Dr. Garg emphasized,  "Again, I would stress that for back pain alone, we do not normally recommend any surgical procedure and should only be considered if all nonsurgical modalities have been tried and failed."

On April 17, 1991 and June 3, 1991, Dr. Dambrogio reported that Fawcett complained of severe back pain.

On August 12, 1991, Dr. Garg examined Fawcett once again, at Fawcett's request for re-evaluation because of continued symptoms of pain in his back with radiation down into his right leg and his desire for surgery.  In a letter to Dr. Dambrogio dated August 13, 1991, Dr. Garg noted the following from his examination: (1) Fawcett still appeared to have considerable paraspinal spasm with restricted spinal movements; (2) flexion was restricted to just below the knee level; (3) straight leg raising on the right side was restricted to about 30 degrees; (4) Fawcett had no motor or sensory

deficits; and (5) Fawcett's gait appeared satisfactory.  Dr. Garg then relayed that he discussed surgical options with Fawcett in view of "his continued symptomotology and a definite central lesion at L4-L5 level, and as he is very keen to go ahead with the procedure which I feel might help him in view of failure on other therapy."

On September 28, 1991, Fawcett elected to undergo a percutaneous discectomy at L4-L5. Dr. Garg performed the surgery.  Fawcett's discharge summary on September 26, 1991 indicated that he had an "excellent result and all his pain in the leg and the back is practically gone.  He is active and mobile."

On November 4, 1991, Dr. Garg once again examined Fawcett.  In a letter to Dr. Dambrogio dated the same day, Dr. Garg wrote that Fawcett seemed to have done very well since the September 1991 surgery and that he had no leg pain and was very pleased with the results.  Dr. Garg relayed that Fawcett's straight leg raising was 70 degrees on the right side and 50 degrees on the left and that the remainder of the examination was completely unremarkable.  Dr. Garg recommended that Fawcett could begin physical therapy and muscle strengthening exercises.

From 1992 through 2003, however, Dr. Dambrogio has reported that Fawcett has continued to complain of lower back pain.

### 3.    Summary Of Dr. Dambrogio's Deposition Testimony

Counsel for Fawcett deposed Dr. Dambrogio, Fawcett's treating physician, on May 9, 2003 in connection with Fawcett's DIB application.  Dr. Dambrogio went into great detail discussing Fawcett's injury, his symptoms, and the examination findings.  For example, Dr. Dambrogio testified:

> Symptomatically, Mr. Fawcett had a radiation of pain that followed a nerve distribution that was consistent with the radiographic and MRI findings.  He had a bulging disc, protruding disc at the L4-5 level, and his nerve distribution and symptoms were consistent with that pain radiating down his leg, and which – is almost pathoneumonic [sic] of radicular pain.

(Tr. 411.)  In addition, Dr. Dambrogio testified in detail that, as of Fawcett's DLI of March 31, 1989, Fawcett met or equaled the requirements for listed disabilities set out at 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04 (referring generally to disorders of the spine).  Dr. Dambrogio further noted that, at that time, Fawcett could not participate in any kind of physical work at all and that he was unable to bend, stoop, or crawl.

Dr. Dambrogio also testified that, after March 31, 1989, Fawcett's symptomotology became worse and that Fawcett eventually had surgery.  Dr. Dambrogio indicated that Fawcett improved somewhat postoperatively, but Fawcett's pain consistently got worse thereafter.

At the end of the deposition, Dr. Dambrogio was asked whether Fawcett has been "able to engage in substantial work activity on a sustained basis" at any point in time from November 9, 1987 to the present.  Dr. Dambrogio responded, "On a sustained basis, no.  I think at various times, because of his – his emotional and socioeconomic situation, he's tried to entertain doing various kinds of work, but he's been unable to sustain any kind of activity at all."

### 4.    Summary Of The M.E.'s Testimony

A non-examining M.E., Dr. Franklin Plotkin, testified at the evidentiary hearing on July 19, 2006.  The M.E. testified that, after reviewing the complete record, including the deposition testimony of Dr. Dambrogio, the objective evidence did not support Fawcett's symptomatic complaints.  In particular, upon questioning by the ALJ, the M.E. stated that there were no objective findings that would support the conclusion that Fawcett suffered from a severe impairment, even

14

after considering Dr. Dambrogio's deposition testimony.[5]

---

[5]
| Q. | Does the objective record that any tests findings, diagnostic conclusions support a severe impairment prior to the alleged onset date of disability, which was either November the 7th of 1987 or November the 9th? There might be a typographic error. |

A.      They do not.

Q.      I'm sorry.  You say it does not?  My question is can you recognize any signs, symptoms, tests, objective findings that would support a severe impairment?

A.      No, I do not.

Q.      All right.  Now the opinions of the deposition, which I made—set forth in a deposition which I made available to you, and, once again, you're saying you did have an opportunity to review it, the Court, that sent this back, I believe, rightly so said it in of itself should not be disregarded, I am regarding it. I am asking you to consider it. I am asking you to—and I realize it's a deposition but it has, you know, empirical value and without going through the deposition in detail, which I don't think is necessary, is there anything in that deposition which would alter your professional medical opinion that there was, in fact, no severe impairment that was substantiated by objective tests, findings, or symptoms?

A.      Okay.  In response to that, I did say at the beginning that it was a little difficult to go through the deposition—

Q.      Yes.  Okay.

A.      —because it's long and it's detailed.  But in answer to the question, I don't think that there is any objective evidence to support these complaints of persistent and worsening pain in the lower back with radiation to the legs.  And I think that there are objective tests that might either disprove or support the complaint of pain.  But pain by itself does not give us any leads.  He has no evidence of atrophy, no evidence of motor weakness, questionable sensory loss that's patchy.  So I find myself not convinced of his complaints, of the voracity [sic] of his complaints.

15

Then, later in the hearing – after the ALJ suggested that the dispositive issue in Fawcett's DIB application was whether Fawcett suffered from a severe impairment and after counsel for Fawcett had briefly summarized Dr. Dambrogio's deposition testimony – the M.E. testified that Dr. Dambrogio's deposition testimony was not credible or substantiated in light of the objective findings that the M.E. testified to earlier.[6]

During the hearing, counsel for Fawcett had an opportunity to cross-examine the M.E. twice,

---

(Tr. 522-24.)

[6]     ALJ:        I have read everything.  Let me transfer back again.  Doctor, in trying to resolve this issue as fairly and in the best light, you know, you've heard the summation, I'll just pose this question again.  I am considering the deposition that was not previously considered.  In total, do you find it to be credible or substantiated—

        ME:         No.

        ALJ:        —in light of the objective findings that you have testified to earlier, sir?

        ME:         No, I do not.  For the diagnosis of a radiculopathy, you need only the symptoms of pain, which, of course, is a resting and draws your attention to the area, but you need the distribution of pain which is not described in the deposition.  And you need some evidence of nerve damage done by an electromyogram or by nerve conduction or both.  You need some objective evidence of protracted nerve injury like atrophy of muscles that should have been involved, weakness of the muscles, fasciculations, and so on, which is not in the deposition.  Dr. D'Ambroglio [sic] supports this by pain and that's all he does.  And what I'm saying is that pain is not enough.  It's a subjective symptom.  It's severity is not measurable although we have over the years accepted the scale as zero to 10 for the ease of the response to how bad it is but it's not an objective evidence of pain.

(Tr. 536-37.)

though she posed few questions at each opportunity.

## II.     STANDARD OF REVIEW

In cases that are referred to a magistrate judge for preparation of a R&R, the Federal Magistrate Act requires that a district court conduct a *de novo* review only of those portions of a R&R to which the parties have made an objection. 28 U.S.C. § 636(b)(1)(C).  The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action, however, is not *de novo*.  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.*  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record. *See Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  The Sixth Circuit instructs that, "[t]he substantial evidence standard allows

considerable latitude to administrative decision makers.  It presupposes that there is a *zone of choice* within which the decision maker can go either way without interference by the courts."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Nevertheless, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## III.    DISCUSSION

To be entitled to DIB, a claimant must be "disabled" within the meaning of Title II of the Social Security Act prior to the expiration of his insured status, or his DLI.  *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).  "Disability" is generally defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A). More specifically, the Social Security Act provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

18

*Id.* at § 423(d)(2)(A).

In making a determination as to "disability," an ALJ is required to follow a five-step sequential analysis set out in the Social Security regulations.  *See* 20 C.F.R. § 404.1520.  The Sixth Circuit has summarized the five steps as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  During the first four steps of the sequential analysis, the claimant has the burden of proof.  *Id.*  At the fifth step, the burden shifts to the Commissioner.  *Id.*

Here, as highlighted above, ALJ Ciccolini denied Fawcett's DIB application at step two of the sequential analysis, holding that Fawcett did not have a severe impairment on or before his DLI of March 31, 1989.  The Magistrate Judge's R&R, however, concluded that the ALJ's holding on that issue was an error of law.  Upon review, the Court agrees with this portion of the R&R.  As will be shown in more detail below, even after affording the utmost deference to the ALJ's decision under the governing standard of review, a fair reading of the entire record and the totality of the evidence reveals that the ALJ's no severe impairment holding is not supported by substantial

evidence given that "the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).

The Court, however, disagrees with the Magistrate Judge's ultimate recommendation that final judgment nevertheless should be entered in the Commissioner's favor.  While the Magistrate Judge may be correct that, upon remand, Fawcett's DIB application will be denied at a later step in the sequential analysis, the Court believes that precedent, and prudence, dictate that Fawcett's action should be remanded for further factual findings by an ALJ consistent with this opinion.

### A.      The ALJ's No Severe Impairment Holding Was An Error Of Law

#### 1.      The Step Two Severe Impairment Requirement Is A "*De Minimis* Hurdle"

At step two of the five-step sequential analysis, Social Security regulations provide that a claimant must prove that he has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  20 C.F.R. § 404.1520(c).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it "significantly limits" an individual's ability to perform basic work activities for twelve consecutive months.  *Id.* at §§ 404.1520(a) and (c).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," which include, among other items, "physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling."  *Id.* at § 404.1521(b).

Since 1985, the Sixth Circuit has consistently construed the severity determination at step two to be a "*de minimis* hurdle" in the disability determination process.  *Anthony*, 266 Fed. Appx. at 457; *Salmi v. Sec. of Health & Human Servs.*, 774 F.2d 685, 690-92 (6th Cir. 1985); *Farris v. Sec. of Health & Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985).  At that time, the Sixth Circuit

determined that "an overly stringent interpretation of the severity requirement would violate the statutory standard for disability by precluding administrative determination of the crucial statutory question: whether, in fact, the impairment prevents the claimant from working, given the claimant's age, education, and experience." *Farris*, 773 F.2d at 89.  The Sixth Circuit therefore narrowed the standard used to deny claims at the second step, holding that "an impairment can be considered as not severe . . . only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience.'" *Id.* at 90 (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).  In other words,

> An impairment qualifies as non-severe only if the impairment would not affect a claimant's ability to work regardless whether the claimant was sixty-years old or only twenty-five, whether the claimant had a sixth grade education or a master's degree, whether the claimant was a brain surgeon, a factor worker, or a secretary.

*Salmi*, 774 F.2d at 691-92.

Also, in 1985, in response to decisions by various circuits reflecting analyses similar to that of the Sixth Circuit, the Social Security Administration ("SSA") promulgated policy ruling SSR 85-28 to clarify when an individual's impairment(s) may be found "not severe."  The SSA essentially adopted the standard that was announced by the Sixth Circuit in *Farris* and *Salmi*.  The SSA wrote, "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . ."  SSR 85-28 ("Medical Impairments That Are Not Severe"); *see also* SSR 96-3p ("Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe") (reaffirming the standard set forth in SSR 85-28).  Further,

the SSA cautioned that "[g]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step." SSR 85-28; *see also* SSR 96-3p ("[I]f, after completing development and considering all of the evidence, the adjudicator is unable to determine clearly the effect of an impairment(s) on the individual's ability to do basic work activities, the adjudicator must continue to follow the sequential evaluation process . . . .").

Accordingly, as stated by the Sixth Circuit, the goal of the severity test at the second step is to "screen out totally groundless claims." *Anthony*, 266 Fed. Appx. at 457 (quoting *Farris*, 773 F.2d at 89); *Higgs*, 880 F.2d at 862-63 (noting that "the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint" or claims that are "obviously lacking medical merit," but also recognizing that it was "now plain that in the vast majority of cases a disability claim may not be dismissed without consideration of the claimant's individual vocational situation"). So, while some claims still may be properly denied at step two, a review of the majority of such cases in the Sixth Circuit reveals that these "exceptional 'totally groundless'" claims contain records without *any* medical evidence indicating that the claimant's condition or impairment limited his or her ability to perform basic work activities. *See Higgs*, 880 F.2d at 863-64. Consequently, as the Sixth Circuit has written on several occasions, "[W]hen doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, this court has regularly found substantial evidence to support a finding of no severe impairment." *Despins v. Comm'r of Soc. Sec.*, 257 Fed. Appx. 923, 930 (6th Cir. 2007).

      **2.**      **The Totality Of The Evidence In The Record Shows That ALJ Ciccolini's No Severe Impairment Holding Was Not Supported By Substantial Evidence**

In light of the "*de minimis*" nature of the severity requirement, the Court concludes that a fair reading of the entire record simply does not support the conclusion that Fawcett's DIB application was "totally groundless" or "obviously lacking medical merit" to justify dismissal at step two of the five-step sequential analysis. The totality of the evidence, when evaluated according to the correct legal standards, indicates that Fawcett met his burden of proving that he suffered from a "severe" impairment on or before his DLI of March 31, 1989 and, more importantly, shows that ALJ Ciccolini's no severe impairment holding was not supported by substantial evidence.

In fact, a mere cursory review of the record reveals that Fawcett suffered from much more than a slight abnormality that had only a minimal effect on his ability to work during the relevant time period. First, in contrast to the majority of Sixth Circuit cases that have affirmed an ALJ's holding of no severe impairment, the medical evidence includes numerous contemporaneous doctors' reports dated prior to Fawcett's DLI, discussing Fawcett's physical limitations and the intensity, frequency, and duration of pain that Fawcett was experiencing as a result of his back injury. For example, Dr. Dambrogio's physical capacities evaluation on January 26, 1988 showed that Fawcett had a whole body strength impairment of 56.95%, a weight restriction of 13 pounds, loss of balance, an inability to assume a full squat or to rise, and a limited range of motion. On February 26, 1988 and March 5, 1988, Dr. Dambrogio reported that Fawcett complained of pain with backward and forward movements and that he was unable to assume a full squat position or rise from a squatting position. At a therapy session on April 5, 1988, Dr. Dambrogio reported that Fawcett was unable to stand-up straight, that he walked with a slight limp, and that Fawcett

23

complained of pain in his lower back and down his legs.  At a therapy session on April 22, 1988, Dr.

Dambrogio reported that Fawcett complained of severe pain and that his back motion was severely

reduced.  On April 28, 1988, Dr. Garg reported that Fawcett had moderate paraspinal muscle spasm

with moderately restricted spinal movements and that Fawcett's straight leg raising was restricted

to about 50 degrees on the right and 60 degrees on the left.  On July 25, 1988, Dr. Dambrogio

prescribed Darovcet N 100 and Flexoril to help relieve Fawcett's complaints of pain.  On September

29, 1988, Dr. Dambrogio reported that Fawcett was experiencing pain that was worse than before

and noted that there was decreased flexion of the lumbosacral spine. On February 20, 1989, Dr.

Dambrogio reported that Fawcett had flexion of 60 degrees, right and left side bending was 10

degrees, and that there was positive leg raising with pain down the right leg from the back.  And on

March 21, 1989, Dr. Dambrogio prescribed Demerol to help relieve Fawcett's pain.[7]  These doctors'

reports alone are enough to distinguish Fawcett's DIB application from the "totally groundless"

---

[7]     There also were numerous doctors' reports dated after Fawcett's DLI of March
        31, 1989, which an ALJ may properly consider where, as here, the post-expiration
        evidence relates back to the claimant's condition prior to the DLI.  *Cf. Wirth v.
        Comm'r of Soc. Sec.*, 87 Fed. Appx. 478, 480 (6th Cir. 2003) (citing *King v. Sec.
        of Health & Human Servs.*, 896 F.2d 204, 205-06 (6th Cir. 1990)).  For instance,
        on April 24, 1989, Dr. Dambrogio fitted Fawcett with a lumbosacral corset to
        relieve his pain.  On August 21, 1989, Dr. Dambrogio reported that Fawcett had a
        limited range of motion, namely, that Fawcett's flexion of the lumbar spine was
        80 degrees with pain, right and left side bending was 5 degrees, and there was
        positive straight leg raising at 10 degrees on the right with pain radiating into the
        buttocks.  On February 28, 1991, Dr. Garg reported that Fawcett showed a lot of
        resistance during spinal movements and would only bend 10-20 degrees, that he
        could not relax, that he appeared to have paraspinal muscle spasm, and that his
        straight leg raising was restricted to about 20 degrees on the right and about 60
        degrees on the left.  On April 17, 1991 and June 3, 1991, Dr. Dambrogio reported
        that Fawcett complained of severe back pain.  And on August 12, 1991, Dr. Garg
        reported that Fawcett still appeared to have considerable paraspinal spasm with
        restricted spinal movements, that Fawcett's motion was limited, and that
        Fawcett's straight leg raising on the right side was restricted to about 30 degrees.

claims that have been dismissed by an ALJ at step two and affirmed by the Sixth Circuit. *Cf., e.g.*, *Despins*, 257 Fed. Appx. at 930-31 (6th Cir. 2007) (affirming an ALJ's holding of no severe impairment where medical records showed no sustained use of medication or treatment prior to claimant's DLI and claimant's doctors did not describe any work-related limitations attributable to his condition).

Second, the record includes the medical opinion of Fawcett's long-time treating physician, Dr. Dambrogio. In a deposition taken on May 9, 2003, Dr. Dambrogio went into great detail regarding Fawcett's condition and opined that, as of his DLI, Fawcett could not participate in any kind of physical work at all and that he was unable to bend, stoop, or crawl. Dr. Dambrogio further testified that Fawcett has been unable to engage in substantial work activity on a sustained basis at any point in time from the date of his back injury to the present. As the Magistrate Judge noted, if the ALJ were to have given *any* credence to Dr. Dambrogio's testimony, it appears that Fawcett would have satisfied his minimal burden at the step two severity determination.

In his decision denying Fawcett's DIB application at step two, however, the ALJ did not reference any of the portions of the doctors' reports that discussed Fawcett's physical limitations and symptoms, nor did he appear to give *any* credence to Dr. Dambrogio's testimony. Instead, the ALJ appeared to base his decision on two grounds: (1) his finding that, even though Fawcett's medically determinable impairment could have been reasonably expected to produce the alleged symptoms, Fawcett's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible"; and (2) his finding that the treating source medical opinion of Dr. Dambrogio in his deposition testimony need not be given controlling weight. In reaching both of these findings, however, the ALJ did not apply the correct legal standards, particularly at the step two severity determination stage, thereby further rendering his decision not supported by substantial

25

evidence.

First, while the credibility determinations of an ALJ are generally to be afforded deference, *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007), the ALJ here based his credibility determination solely on the perceived lack of substantiating objective medical evidence in the record to support Fawcett's complaints of pain, rather than on (or did not do so) an assessment of the record as a whole.  The ALJ also fails to explain sufficiently the extent to which he credited Fawcett's statements regarding his symptom-related limitations in determining whether Fawcett suffered from a "severe" impairment.  *See* SSR 96-7p ("Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements"); SSR 96-3p.  SSR 96-7p expressly provides, "An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p also provides that an ALJ's determination "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  This latter requirement, as noted in SSR 96-3p, is especially important to a proper evaluation of a claimant's impairment at step two:  "Because a determination whether an impairment(s) is severe requires an assessment of the functionally limiting effects of an impairment(s), symptom-related limitations and restrictions must be considered at this step of the sequential evaluation process."  Indeed, as further noted in SSR 96-3p, "If the adjudicator finds that such symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the adjudicator *must* find that the impairment(s) is severe and proceed to the next step in the process even if the objective medical evidence would not in itself establish that the impairment(s) is severe."  SSR 96-3p (emphasis added).

26

Here, in contrast to the directives set out in the above Social Security policy rulings, the ALJ references only certain objective medical findings from the record and then concludes that Fawcett's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." While the ALJ was correct in citing Fawcett's "satisfactory" X-rays taken on November 9, 1987; Fawcett's "unremarkable" MRI of his thoracic spine on March 14, 1990; and Dr. Garg's interpretation of Fawcett's MRI of his lumbar spine on March 7, 1991 as being relevant to determining Fawcett's credibility, the ALJ's recitation of the record is incomplete[8] and, more importantly, impermissibly relies solely on these limited objective medical findings. *See* SSR 96-7p. Instead, an ALJ is required to make a credibility finding based on a consideration of the entire case record, which properly includes a consideration of the objective medical evidence, but also a consideration of the medical opinion evidence and a number of other factors relevant to a claimant's symptoms. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p ("In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence alone, 20 C.F.R. § 404.1529(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements.").[9] The ALJ's ultimate

---

[8]     For example, the ALJ does not even reference all the objective medical evidence in the record, as he fails to mention (1) the results of an EMG taken on February 8, 1989 that, although incomplete due to poor tolerance by Fawcett, were suggestive of L4-L5 radiculopathy; and (2) the results of the CT scan taken on February 8, 1989 that showed evidence of an extradural defect at the L4-L5 level due to disc protrusion to the right. Also, as already noted above, the ALJ did not reference the numerous doctors' reports that discussed Fawcett's physical limitations and symptoms.

[9]     The factors include:

1.       The individual's daily activities;

27

finding that Fawcett's statements are "not entirely credible" also is not "sufficiently specific" under SSR 96-7p, as it does not indicate precisely what weight was accorded Fawcett's statements regarding his symptom-related limitations.  Consequently, there is no indication what limitations, if any, that the ALJ considered in determining whether Fawcett suffered from a "severe" impairment, as was required under SSR 96-3p.

In regard to the second finding by the ALJ – that Dr. Dambrogio's medical opinion is not entitled to controlling weight – there was an error of law in so far as there was nothing in the decision that indicated that the ALJ continued to weigh Dr. Dambrogio's opinion as he was required to do.  *See Rogers*, 486 F.3d at 242; 20 C.F.R. § 404.1527; SSR 96-2p ("Giving Controlling Weight to Treating Source Medical Opinions").  As noted by the Sixth Circuit, even if the treating physician rule (requiring that the treating physician's opinion be given controlling weight) does not apply, an ALJ must continue to weigh the treating physician's opinion under additional factors, including, "the

---

2.  The location duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – *in determining what weight to give the opinion*." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)-(6)) (emphasis added); *see Rogers*, 486 F.3d at 242 ("[T]here remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding.").  Indeed, SSR 96-2p confirms the importance of the continued-weighing requirement, by emphasizing that a treating source's medical opinion that is not given controlling weight is not automatically rejected and often should still be adopted by an ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 . . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Here, while stating that he was aware of SSR 96-2p, the ALJ gave no indication that he applied the mandatory continued-weighing procedure set forth in the ruling.  Instead, the ALJ extensively referenced the M.E.'s testimony, and apparently after adopting the M.E.'s testimony almost entirely,[10] concluded without further analysis that "the treating source medical opinion of Dr.

---

[10]     The Court notes that the ALJ committed a further error, by not evaluating the M.E.'s opinion under any of the applicable regulatory factors.  The ALJ failed to comply with the requirement directing an ALJ to evaluate all medical opinions, including opinions by non-examining sources, "using all relevant factors" including supportability, consistency, and specialization described in 20 C.F.R. § 1527(d).  20 C.F.R. § 1527(f); *see also* SSR 96-6p ("Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative

Dambrogio in his deposition testimony may not be given controlling weight because it is inconsistent with the other substantial evidence in the case record and is not well-supported by medically acceptable clinical and laboratory diagnostic techniques (SSR 96-2p)." While the Court could assume that, given the decision to deny Fawcett's DIB application at step two, the ALJ implicitly rejected Dr. Dambrogio's opinion in full and accorded it no weight whatsoever, Social Security regulations and policy rulings require him to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6) to determine what weight to give Dr. Dambrogio's opinion, notwithstanding its non-controlling status. Moreover, by neglecting to conduct this analysis, the ALJ committed a further error by not complying with 20 C.F.R. § 404.1527(d)(2), which provides that the Commissioner "will always give good reasons in our notice of determination of decision for the weight we give [the claimant's] treating source's opinion." *See Wilson*, 378 F.3d at 544. And finally, the Court concludes that these errors by the ALJ in evaluating opinion evidence in the record, while subject to harmless error analysis in the Sixth Circuit, *see Bowen*, 478 F.3d at 747-48, were not harmless in light of the Court's earlier conclusion that Fawcett would have satisfied his minimal burden at the step two severity determination if the ALJ were to have given *any* credence to Dr. Dambrogio's testimony.[11]

---

Review; Medical Equivalence").

[11]     The Court also notes the importance of upholding mandatory procedural requirements to protect a claimant's right to due process:

A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. "[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway." . . . To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with 20 C.F.R. § 1527(d)(2), would afford the

In sum, a fair reading of the entire record in Fawcett's case – including consideration of the doctors' reports discussing Fawcett's physical limitations and symptoms and Dr. Dambrogio's medical opinion – when evaluated according to the correct legal standards, reveals that the ALJ's no severe impairment holding was not supported by substantial evidence given that the step two severity determination is such a "*de minimis* hurdle."  The ALJ's conclusory findings do not amount to substantial evidence for the proposition that Fawcett was not severely impaired, *i.e.*, that Fawcett had asserted the type of "totally groundless" claim that is subject to dismissal at step two of the sequential analysis.  While it is true, as the Magistrate Judge found, that the ALJ was entitled to conduct a *de novo* review of Fawcett's entire application (even though the remand order was based on an error at step five of the analysis by the first hearing officer), it is notable that ALJ Brundage found a "severe impairment" when he reviewed the medical record in this matter.

**B.      Fawcett's DIB Application Should Be Remanded**

Having agreed with the Magistrate Judge's conclusion that ALJ Ciccolini's no severe impairment holding was not supported by substantial evidence, the Court must next determine whether it should adopt the Magistrate Judge's ultimate recommendation that final judgment nevertheless should be entered in the Commissioner's favor, because ordering yet another remand would likely result in a finding of no disability at a later step in the sequential analysis.  While the Magistrate Judge may be correct that, upon remand, Fawcett's DIB application will be denied once

---

Commissioner the ability the violate the regulation with impunity and render the protections promised therein illusory.  The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to "set aside agency action . . . found to be . . . without observance of procedure required by law."

*Wilson*, 378 F.3d at 546 (internal citations omitted).

again – and possibly in reliance on much of the same analysis set forth in ALJ Ciccolini's decision (assuming, of course, a proper evaluation of the evidence in light of the different standards that govern the third, fourth, and fifth steps of the sequential analysis), the Court has not come across a single case to support the Magistrate Judge's recommendation and, indeed, even the Commissioner does not argue that final judgment should be entered on this basis.  Instead, the more appropriate inquiry seems to be whether to remand the case for rehearing, or to reverse and order an award of benefits.  In this regard, the Court concludes that the administrative record does not support the extraordinary relief of ordering an award of benefits.  *See Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) ("A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking."); *see also De Grande v. Sec. of Health & Human Servs.*, Case No. 89-1431, 1990 U.S. App. LEXIS 58, at *9 n.4 (6th Cir. Jan. 2, 1990) (per curiam) ("A *per se* rule of remand for further analysis is far more appropriate in step two cases where the Secretary has not yet given consideration to the claimant's residual functional capacity than in step four cases where residual functional capacity necessarily has been addressed.").  Accordingly, while it is frustrating to have to do so once again, the Court remands Fawcett's case for a continued evaluation of his DIB application, starting at step three of the five-step sequential analysis.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **VACATES** the final administrative decision of the Commissioner and **REMANDS** this case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

*s/Kathleen M. O'Malley*
**KATHLEEN  McDONALD  O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated:  September 16, 2008**

33